

Filed/Docketed
Mar 26, 2024

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IN RE:<br><br>**CHRISTOPHER RYAN ESTER,**<br><br>  Debtor. | Case No. 21-10379-M<br>Chapter 7 |
| **CHRISTOPHER RYAN ESTER,**<br><br>  Plaintiff,<br>v.<br><br>**PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY** d/b/a American Education Services,<br><br>  Defendant,<br>and<br><br>**NAVIENT SOLUTIONS, LLC,**<br><br>  Defendant,<br>and,<br><br>**NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-1,**<br><br>  Defendant,<br>and,<br><br>**EDUCATIONAL CREDIT MANAGEMENT CORPORATION,**<br><br>  Intervenor-Defendant. | Adversary No. 22-01003-M |

## MEMORANDUM OPINION

*The burden of a debt which can never realistically be repaid constitutes an undue hardship. The debtor must be able, at least over the long haul, to slay the beast, not merely keep it at bay.*[1]

---

[1] *Coats v. N.J. Higher Educ. Assistance Auth. (In re Coats)*, 214 B.R. 397, 403-04 (Bankr. N.D. Okla. 1997) (Michael, J.).

Simple words, written by this judge almost 27 years ago, at the beginning of a judicial career. Yet they ring as true now as then. While the United States Bankruptcy Code and the cases interpreting its provisions regarding the discharge of student loans impose a heavy burden upon debtors, that standard is not, and should not ever be, impossible to satisfy.

The facts of this case are unique. The holder of a student loan has reduced its claim to judgment. The original repayment terms of the loan are nothing more than a memory, replaced by the garnishment laws of the State of Oklahoma. Those laws allow our creditor to exact a very large pound of flesh from our debtor, which it has done. After suffering under this burden for a time, the debtor sought the protection of this Court and now seeks a finding that further labor under the weight of this garnishment would be an undue hardship. Our creditor acknowledges the onerous nature of the garnishment, but suggests the debtor alter his meager lifestyle in order to bear it, or that this Court fashion a less burdensome alternative. On the facts of this case, neither option is palatable. The following findings of fact and conclusions of law are made pursuant to Federal Rule of Bankruptcy Procedure 7052.

## Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b).[2] Venue is proper pursuant to 28 U.S.C. § 1409. Reference to the Court of this adversary proceeding is made pursuant to 28 U.S.C. § 157(a). The decision whether a particular debt is dischargeable is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(I).

---

[2] Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq.

**Dismissal of Certain Defendants**

As a preliminary matter, Defendants Pennsylvania Higher Education Assistance Agency, d/b/a American Education Services, and Navient Solutions, LLC have been dismissed from this adversary proceeding by stipulation[3] or order.[4] The debtor's claim for relief against Educational Credit Management Corporation ("ECMC") has been resolved through stipulated partial judgment.[5] Only the claim against National Collegiate Student Loan Trust 2007-1 ("NCSLT") remains.

**Findings of Fact**

*The Loan*

In 2007, Christopher Ryan Ester ("Ester" or "Plaintiff") received a student loan from Bank of America, NA (the "Loan"), in the amount of $33,519.55.[6] The Loan was contemporaneously sold to NCSLT, the remaining defendant in this case. After an original deferment period, payment on the Loan was first due on January 5, 2011, with an expected repayment period of 240 months, or 20 years.[7] Ester made payments totalling $395.79 on the Loan through its servicer, American Education Services ("AES"), until at least September 3, 2012.[8] Around that date, AES stopped servicing the Loan. Sometime thereafter, the Loan fell into default.

---

[3] *See* Joint Stipulation of Dismissal, ECF No. 17.

[4] *See* Agreed Order Discharging Educational Loan Debt Between Plaintiff and Navient Solutions, LLC and Dismissing Navient as a Defendant in this Adversary Proceeding, ECF No. 37.

[5] *See* Stipulated Partial Judgment, ECF No. 76.

[6] Def.'s Exs. 201, 202. The original loan request was for $30,000. The amount originally financed included various fees, including an origination fee of 10.5 percent. The Loan incurred interest at a variable rate, calculated at 14.693 percent at the time of dispersal. *Id*.

[7] Pl.'s Ex. 15-6; Def.'s Ex. 202.

[8] Pl.'s Ex. 15.

On April 5, 2013, Ester filed his first voluntary petition under chapter 7 of the Bankruptcy Code.[9] He did not seek discharge of any student loans during his first bankruptcy case. This case was unremarkable. A discharge was entered on July 9, 2013, and the case was closed in due course.[10] The debt to NCSLT was unaffected.

On February 1, 2016, NCSLT brought a collection action against Ester in the Tulsa County District Court, Case No. CJ 2016-417.[11] A judgment was entered against Ester in the amount of $69,266.06.[12] After nearly three years of litigation, the judgment was made final. NCSLT proceeded to garnish Ester's wages at the rate of more than $900 per month from January 2020 until April 2021.[13] In total, NCSLT has collected at least $13,408.76 from Ester through garnishments.[14] The burden of the garnishments led Ester to file the present voluntary chapter 7 bankruptcy petition, his second, on April 9, 2021 (the "Petition Date").

As of July 14, 2023, NCSLT's judgment had a balance of $56,324.96,[15] and it continues to accrue post-judgment interest pursuant to Oklahoma law, at the rate of 9.5 percent throughout 2023, and a rate of 10.5 percent in 2024.[16] With accumulated interest, the amount currently owed to NCSLT is approximately $60,000.[17]

---

[9] Pl.'s Ex. 3 (*In re Ester*, Ch. 7 Case No. 13-10780-R (Bankr. N.D. Okla.)).

[10] Pl.'s Ex. 4.

[11] Pre-Trial Order at 3 ¶ II(F)(6), ECF No. 71.

[12] *Id.* at 3 ¶ II(F)(7).

[13] Pl.'s Ex. 16-3 to -5.

[14] *Id.* at 16-1.

[15] Pre-Trial Order at 3 ¶ II(F)(9), ECF No. 71.

[16] *See* Plaintiff's Closing Argument at 6, ECF No. 79; Okla. Stat. tit. 12, § 727.1. Neither party submitted a copy of NCSLT's judgment, therefore the Court must rely on the parties' characterization of its terms.

[17] This rough calculation includes an additional 6 months of interest in 2023 since the July 14, 2023, calculation, plus 2 months of interest in 2024.

*Ester's Educational and Employment History*

  Ester is 45 years old. He has no dependents, only pets (a dog and two cats). Following his discharge from the United States Army in 1999, Ester worked a variety of low-wage jobs before deciding to invest in himself and his future. To this end, Ester enrolled in the Flight Instructor Certification Course (the "Course") at Spartan College of Aeronautics and Technology.[18] The Course required both classroom and actual flight hours, with estimated completion in forty-eight months. Ester attended the program part time from 2004 to 2010 and received 350 flight hours. By 2010, Ester was struggling to pay the student loans he had already incurred and felt he could not continue in the Course without further burdening himself with additional student loan debt. Ester dropped out and did not complete the Course or receive a degree or other certification from which he could benefit in an economically remunerative way.

  Like many students, Ester financed his education through federal, state, and private student loans. Two private loans were obtained from Bank of America—one of which is the NCSLT Loan at issue in this case. As his loans became due, Ester made a single payment to AES each month, which was then allocated among his private and federal student loan creditors, including NCSLT and ECMC. To date, Ester has paid off one of his private Bank of America loans and his state loan. The federal student loan owed to ECMC was not in default as of the Petition Date.[19] As part of this proceeding, ECMC has agreed to settle the remaining balance of his federal student loan under the term that Ester will pay ECMC $300 per month for 60 months.[20] A similar arrangement could not be reached with NCSLT.

---

[18] Pl.'s Ex. 14-4.

[19] Pre-Trial Order at 4 ¶ II(G)(7), ECF No. 71.

[20] *See* Stipulation for Partial Judgment as to ECMC, Only, ECF No. 75.

Ester has been steadily employed since leaving the Army. He began working full-time with United States Aviation Co. ("Aviation") while attending the Course. A degree was not required for his employment. Ester worked for Aviation for seventeen years, working his way up to Line Operations Manager.[21] From 2017 to 2021, Ester's annual adjusted gross income, as reported to the Internal Revenue Service, averaged $52,576.[22] His income slightly exceeded $60,000 in 2020 because he was working seven days a week including many overnight shifts. In July 2022, he was let go from Aviation following a pay dispute that arose after he requested higher wages. Ester sought an increased salary so he could meet the pressures of paying his student loan obligations. After leaving Aviation, Ester found employment with Wachob Oil & Gas LLC ("Wachob") as an aircraft detailer. His position with Wachob also does not require a degree. He now earns $25 per hour but is not consistently offered 40 hours of work each week.[23] Ester works all shifts offered to him, including overtime when available.

*Ester's Current Financial Circumstances*

At trial, Ester submitted a budget showing his current net monthly income, after taxes and health insurance, to be $3,856.75.[24] His current monthly expenses are $3,852.16, leaving a disposable income of $4.59.[25] Ester testified that this calculation should be amended to include an additional $165 from his recently obtained Veterans Affairs ("VA") disability benefits. Despite

---

[21] Pre-Trial Order at 5 ¶ II(H)(3), ECF No. 71.

[22] Plaintiff's 2021 tax return reflects an adjusted gross income ("AGI") of $53,584, his 2020 tax return reflects an AGI of $62,993, his 2019 tax return reflects an AGI of $52,610, his 2018 tax return reflects an AGI of $47,898, and his 2017 tax return reflects an AGI of $45,797. Pre-Trial Order at 5 ¶ II(H)(9), ECF No. 71; Pl.'s Exs. 7–11.

[23] Pre-Trial Order at 5 ¶ II(H)(4), ECF No. 71.

[24] Pl.'s Ex. 19-2.

[25] *Id*. at 19-4.

stipulating in the Pre-Trial Order that he does not suffer from any mental or physical disability,[26] Ester is now seeking treatment from the VA for injuries stemming from his service in the Army, including knee, hip, and neck pain and a partially-amputated thumb. Ester testified that any pain or difficulties are manageable, but, given these conditions, he does not believe his body can sustain many more years of overtime work.

When not working, Ester maintains a frugal lifestyle. His expenses include payments on a ten-year-old Ford Taurus, which has over 133,000 miles.[27] The Taurus is currently operable, but no car (including a Ford Taurus) lasts forever. Ester lives in a modest home and makes a monthly mortgage payment of $955.16.[28] The home suffers from foundation issues that render at least one room unusable. Ester currently lives alone, but previously lived with a roommate who was a close friend. This was not a positive experience for him, nor is it one he wishes to repeat, in part because his home was damaged by the roommate's dog. Ester's budget includes necessary expenses for items such as utilities, pet expenses, transportation, and a nondischargeable tax liability. The only nominal "luxuries" in Ester's budget are a satellite television bill, modest charitable contributions, and contributions to an IRA, all of which he intends to cancel to make his payments to ECMC.

To the extent the "Conclusions of Law" contain any items that should more appropriately be considered "Findings of Fact," they are incorporated herein by this reference.

## Conclusions of Law

The question in this case is whether repayment of the Loan would impose an undue hardship on Ester pursuant to § 523(a)(8), which provides:

---

[26] Pre-Trial Order at 5 ¶ II(H)(6), ECF No. 71.
[27] Pl.'s Exs. 19-4, 1-11.
[28] *Id*. at 19-3.

> (a) A discharge under section 727, 1141, 1192 [,] 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> . . . .
>
> (8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for—
>
> > (A) (i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or
> >
> > (B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual[.][29]

In 2004, the United States Court of Appeals for the Tenth Circuit adopted the applicable test for dischargeability of student loans contained in *Brunner v. New York State Higher Education Services Corp.* (hereafter "*Brunner*").[30] The *Brunner* test requires the debtor establish:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.[31]

Under *Brunner*, all three elements must be proven by a preponderance of the evidence.[32] If a debtor fails to establish any factor, the debt is nondischargeable.[33]

---

[29] § 523(a)(8).

[30] *Educ. Credit Mgmt. Corp. v. Polleys*, 356 F.3d 1302, 1309 (10th Cir. 2004) (adopting *Brunner*, 831 F.2d 395 (2d Cir. 1987)).

[31] *Brunner*, 831 F.2d at 396.

[32] *Tingling v. Educ. Credit Mgmt. Corp. (In re Tingling)*, 990 F.3d 304, 308-09 (2d Cir. 2021) (first citing *Brunner*, 831 F.2d at 396; and then citing *Grogan v. Garner*, 498 U.S. 279, 291 (1991)).

[33] *Polleys*, 356 F.3d at 1307.

8

A "determination of undue hardship is case- and fact-specific."[34] Courts should not be "overly restrictive [in their] interpretation of the *Brunner* test" lest they undermine "the Bankruptcy Code's goal of providing a 'fresh start' for the honest but unfortunate debtor."[35] Nor must a debtor's circumstances be so dire as to evince a "certainty of hopelessness."[36] In analyzing a debtor's prospects for the future, courts should not rely on "unfounded optimism" that cannot be supported by "specific articulable facts."[37] Bankruptcy courts have "discretion to weigh all the relevant considerations" and should apply the *Brunner* test "such that debtors who truly cannot afford to repay their loans may have their loans discharged."[38]

*Present Inability to Pay*

The first step under the *Brunner* test is to determine whether, if required to repay the Loan, Ester can maintain a minimal standard of living based on his current income and expenses.[39] The "minimal standard of living" requirement does not compel a debtor to live in poverty.[40] The standard allows a debtor to meet basic needs with some allowances for recreation.[41] The amount

---

[34] *King v. Vt. Student Assistance Corp. (In re King)*, 368 B.R. 358, 367 (Bankr. D. Vt. 2007) (citation omitted). *See also Polleys*, 356 F.3d at 1309 ("It is correct to state that Congress wanted undue hardship to be a fact-specific standard.").

[35] *Polleys*, 356 F.3d at 1308 (citing *Stellwagen v. Clum*, 245 U.S. 605, 617 (1918)).

[36] *Id*. at 1310 (rejecting the standard established by the United States Court of Appeals for the Seventh Circuit in *In re Roberson*, 999 F.2d 1132, 1136-37 (7th Cir. 1993)).

[37] *Id*. (quoting Robert F. Salvin, *Student Loans, Bankruptcy, and the Fresh Start Policy: Must Debtors Be Impoverished to Discharge Educational Loans?*, 71 Tul. L. Rev. 139, 197 (1996)).

[38] *Id*. at 1309.

[39] *Id*. at 1309-10; *Brunner*, 831 F.2d at 396.

[40] *Clavell v. U.S. Dep't of Educ. (In re Clavell)*, 611 B.R. 504, 516 (Bankr. S.D.N.Y. 2020); *Lopes v. U.S. Dep't of Educ. (In re Lopes)*, Ch. 7 Case No. 15-13272, Adv. No. 16-1097, 2018 WL 11421925, at *13 (Bankr. D. Colo. June 28, 2018); *Murray v. ECMC (In re Murray)*, 563 B.R. 52, 58 (Bankr. D. Kan. 2016), *aff'd*, No. 16-2838, 2017 WL 4222980 (D. Kan. Sept. 22, 2017).

[41] *Coll. Assist v. Gubrath (In re Gubrath)*, 526 B.R. 863, 869-70 (D. Colo. 2014) ("[e]ven under the minimal standard of living test, people must have the ability to pay for some small diversion

of the debt and the ability of the debtor to make meaningful payments toward amortization of the debt are other factors to be considered.[42] As previously noted, "[t]he burden of a debt which can never realistically be repaid constitutes an undue hardship."[43]

The Loan has been reduced to judgment, with a current balance approaching $60,000, which currently accrues post-judgment interest at 10.5 percent per annum. Ester does not have sufficient liquid assets to satisfy the judgment in full. Under Oklahoma law, NCSLT has the right to garnish 25 percent of Ester's disposable (i.e., after tax) earnings each week until the Loan is fully repaid.[44] Prior to the filing of the present bankruptcy case, NCSLT was garnishing roughly $900 per month from Ester's wages. Given little change in Ester's earnings, the Court finds, unless the Loan is discharged, NCSLT would once again be allowed to extract $900 per month from Ester's earnings. At that pace, given the current interest rate, the garnishment would continue between 8 and 9 years to fully repay the Loan.[45] Ester's current budget shows disposable income of roughly $169.59 per month,[46] not including the $300 monthly payment he will begin making to

---

or source of recreation, even if it is just watching television or keeping a pet." (quoting *McLaney v. Ky. Higher Educ. Assistance Auth. (In re McLaney)*, 375 B.R. 666, 674 (M.D. Ala. 2007))).

[42] *Coats v. N.J. Higher Educ. Assistance Auth. (In re Coats)*, 214 B.R. 397, 403-04 (Bankr. N.D. Okla. 1997). *See also In re Clavell*, 611 B.R. at 515-16 ("*Brunner* calls for a court to determine whether a debtor can afford to 'repay' student loans.").

[43] *In re Coats*, 214 B.R. at 403.

[44] *See* Okla. Stat. tit. 14A, § 5-105(2)(a). The Court notes that the Oklahoma garnishment statute uses the term "disposable earnings" to mean "that part of the earnings of an individual remaining after the deduction from those earnings of amounts required by law to be withheld," (i.e., taxes), which is slightly different from the term "disposable income," used in the bankruptcy context to mean a debtor's currently monthly income less amounts reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor. *See, e.g.,* § 1325(b)(2); § 1191(d).

[45] The repayment period is calculated based on a payoff balance of $60,000, monthly garnishments of $900, and a continuing interest rate of 10.5 percent.

[46] This calculation includes $4.59 reflected in Ester's prepared budget and $165 from his recently obtained VA benefits. Pl.'s Ex. 19; Plaintiff's Closing Argument at 7, ECF No. 79.

ECMC. After this expense is added, Ester has no excess disposable income, and no available funds to apply toward the Loan.

NCSLT contends Ester can pay the Loan because he "regularly earns wages of nearly $60,000 per year."[47] This is a gross misrepresentation of Ester's earning history. Ester's annual adjusted gross income exceeded $60,000 only once in the years between 2017 and 2021, with the average being closer to $52,500.[48] His current earnings and budget already reflect working 40 hours per week when he can, plus any available overtime. Given his education and work experience, the Court finds Ester is currently maximizing his income. Neither *Brunner* nor *Polleys* requires more.

NCSLT argues Ester is not currently at a "minimal standard of living," and should be required to squeeze his expenses further to accommodate repayment of the Loan. So where, pray tell, is Ester to squeeze the additional $900 a month from his budget? NCSLT ignores that his monthly income is primarily obligated to non-discretionary necessary expenses—such as his mortgage, car payment, utilities, and payment of a nondischargeable tax bill.[49] None of these expenses are excessive or unreasonable; quite the opposite, they are minimal. NCSLT then sets its

---

[47] NCSLT's Closing Brief at 8, ECF No. 80.

[48] Pre-Trial Order at 5 ¶ II(H)(9), ECF No. 71; Pl.'s Exs. 7–11.

[49] Specifically, on a monthly basis, Ester spends $955.16 for housing, $387 for his car payment, and $325 in utilities. Pl.'s Ex. 19-3 to -4. Any suggestion that the housing expense is excessive is ludicrous, nor will this Court entertain the idea that Ester should reduce his housing costs by selling his current home (an exempt asset free and clear of any claim NCSLT could possibly make) and find a cheaper place to live. Ester has absolutely no control over utility costs, as they are dictated by the municipality or utility provider. Finally, Ester, just like almost every other debtor in bankruptcy, needs a car to function in our society, and he has to pay for it. *See* Terrence L. Michael, *Restoring the Fresh Start: Four Areas of Consumer Bankruptcy Law That Need to be Fixed* Now, 30 Am. Bankr. Inst. L. Rev. 61, 63 (2022) (noting the importance of an automobile in American society, especially among those with lower incomes). No bankruptcy debtor, including Ester, is required to sacrifice his fresh start at the altar of student loan nondischargeability.

sights on Ester's budget for food, charity, and retirement contributions. Ester eats just one meal a day, and rarely if ever dines at restaurants, which the Court finds to be immanently reasonable. As for other expenses NCSLT demands he eliminate, Ester intends to remove any remaining "luxuries" from his budget, such as his satellite television service, charitable contributions, and IRA contribution, in order to make payments to ECMC. There are no items left for Ester to cut. While Ester is currently able to maintain a minimal standard of living, he does not have the ability to pay the entire balance of the Loan. Allowing NCSLT to garnish an additional $900 each month from his already modest budget would impose a tremendous hardship on Ester. In fact, NCSLT admits as much.[50] Ester has met the first element under *Brunner*.

*Future Ability to Pay*

The second element of the *Brunner* test requires a determination of whether Ester's present "state of affairs is likely to persist for a significant portion of the repayment period,"[51] with the inquiry "limited to the foreseeable future, at most over the term of the loan."[52] In particular, courts should be wary to impute future ability to repay a student loan for which the debtor did not receive the sought degree.[53] The question in this case is whether Ester's inability to pay is likely to continue over the next decade, which is approximately the repayment period if NCSLT were allowed to garnish Ester's wages at the legal rate under Oklahoma law.

---

[50] NCSLT's Closing Brief at 2, ECF. No. 80 ("NCSLT, however, acknowledges that, while capable of paying something, [Ester] may not be capable of paying the entire Loan in a lump sum, and the maximum allowable garnishment amounts would be difficult to maintain."). "Difficult to maintain" is, to put it charitably, an understatement. Taking $900 from Ester's budget every month would result in his economic collapse.

[51] *Polleys*, 356 F.3d at 1310; *Brunner*, 831 F.2d at 396.

[52] *Polleys*, 356 F.3d at 1310.

[53] *In re Coats*, 214 B.R. at 404 (first citing *Reilly v. United Student Aid Funds, Inc. (In re Reilly)*, 118 B.R. 38, 41 (Bankr. D. Md. 1990); and then citing *Elebrashy v. Student Loan Corp. (In re Elebrashy)*, 189 B.R. 922, 928 (Bankr. N.D. Ohio 1995)).

Ester's employment as an airplane detailer provides him with a moderate income. Despite devoting considerable time and effort to the Course at Spartan, he did not complete the necessary training as a flight instructor that would allow him to benefit economically from the program. Without additional credentials from the Course, Ester is unlikely to find more gainful employment. Given the length of time since his original matriculation, he would likely need to restart the Course in order to earn such certifications. Ester's budget does not allow for future tuition payments, and he is unwilling to pursue any career path that would require additional borrowing. Ester's attempt to advocate for higher wages while working for Aviation resulted in the loss of that job. Although he was able to find similar work, he now earns less despite his efforts to work all available overtime shifts. The Court is satisfied that Ester has undertaken all reasonable attempts to maximize his earnings given his education and work experience. At least for the foreseeable future, Ester has reached his earning potential, and it is unrealistic to expect him to substantially increase his earnings.[54]

NCSLT asserts Ester could generate additional income by opening his home to a roommate. This argument ignores Ester's testimony that at least one "available" room in Ester's home is unlivable due to foundation issues. In addition, Ester's prior effort to live with a roommate ended disastrously and his home was damaged. Since this experience, Ester testified that he does not know anyone else who he would trust to live with and is wary of inviting strangers to live in

---

[54] Some courts have considered "maxing out" one's career to be sufficient to show additional circumstances that inhibit a debtor from being able to pay a debt in the foreseeable future. *See Stewart-Johnson v. Sallie Mae Servicing (In re Stewart-Johnson)*, 319 B.R. 192, 196 (Bankr. D. Ariz. 2005) (*Brunner*'s second prong could be established by "evidence that [the debtor] had 'maxed out' in her career." (quoting *Nys v. Educ. Credit Mgmt. Corp. (In re Nys)*, 308 B.R. 436, 444 (9th Cir. BAP 2004), *aff'd*, 446 F.3d 938 (9th Cir. 2006))); *Love v. U.S. Dep't of Educ. (In re Love)*, 649 B.R. 556, 569 (Bankr. E.D. Cal. 2023) (second prong of *Brunner* satisfied where there was "no upward career path presently available to the debtor.").

13

his home. Application of the *Brunner* test "should not be used as a means for courts to impose their own values on a debtor's life choices."[55] This sentiment should likewise prevent a court from imposing its will on the intimacy of a debtor's home.

Regarding Ester's expenses, the Court finds that his mortgage payments will continue well into the future. Likewise, he will need to maintain car payments and a budget for replacement/repair of his automobile when the time comes.[56] The payments to ECMC are expected to last at least the next five years. Ester's current inability to squeeze an additional $900 from his budget without undue hardship will extend into the foreseeable future, and at least for the next decade. The second element of the *Brunner* test has been satisfied.

*Good Faith*

Under the third prong of *Brunner*, courts must determine if a debtor has made a good faith effort to repay their student loans.[57] This inquiry "should focus on questions surrounding the legitimacy of the basis for seeking a discharge[,]" in order to prevent a debtor who "willfully contrives a hardship" from receiving a discharge of loans under § 523(a)(8).[58] A finding of good faith is not precluded by failure to make payments on a loan.[59] Rather, the inquiry is whether the

---

[55] *Polleys*, 356 F.3d at 1310. *See also In re Stewart-Johnson*, 319 B.R. at 198 (discouraging courts from "micro-managing [a] debtor's lifestyle[.]").

[56] *See Norris v. Educ. Credit Mgmt. Corp. (In re Quarles)*, Ch. 7 Case No. 02-40709, Adv. No. 02-7089, 2004 WL 2191608, at *6 (Bankr. D. Kan. Apr. 22, 2004) (vehicle maintenance/replacement costs would remain constant in debtor's budget); *Loyle v. U.S. Dep't of Educ. (In re Loyle)*, Ch. 7 Case No. 19-10065, Adv. No. 20-5073, 2022 WL 567724, at *13 (Bankr. D. Kan. Feb. 24, 2022) (same).

[57] *Polleys*, 356 F.3d at 1310; *Brunner*, 831 F.2d at 396.

[58] *Alderete v. Educ. Credit Mgmt. Corp. (In re Alderete)*, 412 F.3d 1200, 1206 (10th Cir. 2005) (quoting *Polleys*, 356 F.3d at 1310).

[59] *Polleys*, 356 F.3d at 1311 (citing *In re Coats*, 214 B.R. at 405). NCSLT argues that Ester has not made good faith efforts because most of his payments have been involuntary, i.e., from garnishments. First, Ester did make voluntary payments on the Loan when it was being serviced by AES. Pl.'s Ex. 15. Second, the Court is unpersuaded that involuntary payments are dispositive

14

debtor has made "efforts to obtain employment, maximize income, and minimize expenses."[60] For Ester, the answer is a resounding yes.

Ester has been steadily employed during his life, including working full-time while enrolled in the Course. He has consistently worked overtime when available, and, at times worked seven days a week to maximize his earnings. These efforts allow him, for the most part, to meet his obligations of daily living. He has satisfied his obligation on other student loans, including a separate loan issued by Bank of America, paid ECMC over $22,000, and paid NCSLT almost $14,000 toward the Loan, the latter mostly through various garnishments. Ester made some payments toward the Loan while it was being serviced by AES. Ester's lifestyle is spartan; he drives an old car, eats a single meal a day, and does not indulge in personal entertainment.

When analyzing whether a debtor has acted in good faith, courts will often consider a debtor's effort to cooperate with a lender or otherwise work out a payment plan.[61] Because the Loan was a private student loan, NCSLT was not required to offer any option to Ester to rehabilitate the Loan under alternative, more affordable terms, such as forbearance or deferment,

---

of bad faith. *See Edwards v. Navient Solutions, Inc. (In re Edwards)*, 561 B.R. 848, 859 (Bankr. D. Kan. 2016) ("[T]he inquiry for the third prong is not necessarily limited to the amount or number of payments a debtor has made, but instead, to an analysis whether the debtor has made a good faith attempt to repay the loan by maximizing income and minimizing expenses.").

[60] *Innes v. Kansas (In re Innes)*, 284 B.R. 496, 510 (D. Kan. 2002) (citation omitted). *See also Polleys*, 356 F.3d at 1312 (good faith "can be satisfied by a showing that [the debtor] is actively minimizing current household living expenses and maximizing personal and professional resources.").

[61] *See Polleys*, 356 F.3d at 1312. Nothing in this Memorandum Opinion should be construed as requiring participation in such programs as a prerequisite to a finding of undue hardship. *See In re Alderete*, 412 F.3d at 1206 (10th Cir. 2005) (recognizing that participation in repayment plans is not required, but can be an indicator of good faith when such programs are available); Terrence L. Michael and Janie M. Phelps, *"Judges?! – We Don't Need No Stinking Judges!!!": The Discharge of Student Loans in Bankruptcy Cases and the Income Contingent Repayment Plan*, 38 Texas Tech L. Rev. 74 (2005).

and it chose not to do so. Ester's only option has been to pay the Loan on NCSLT's terms. As part of this adversary proceeding, he settled his debt with ECMC and is resuming payments. Ester sought to settle NCSLT's loan during both the state court litigation and this adversary, to no avail. The failure to reach a settlement does not impute a lack of cooperation on Ester's part. Based on Ester's actions and lifestyle, the Court is satisfied that he has acted in good faith to repay the Loan. Ester has met the final element of the *Brunner* test.

*The Possibility of Partial Discharge*

Where a debtor meets their burden to show repayment of a student loan debt would impose an undue hardship on themselves or their dependents, the loan should be discharged under § 523(a)(8).[62] Ester has shown that repayment of the Loan under its present terms, in any capacity, would be an undue hardship. NCSLT nevertheless insists Ester has the ability to pay some amount toward the Loan and asks this Court to fashion a partial discharge of its debt. NCSLT has indicated that it would be willing to "stipulate to [payment] terms the Court finds feasible," and agrees not to garnish beyond those "agreed-to" terms.[63] The Court understands NCSLT's "offer" to mean it expects the Court, in the first instance, to determine a nondischargeable amount and then craft an acceptable payment schedule for the nondischarged debt. In other words, after twice being unable to settle the matter with Ester, NCSLT now asks the Court to a make a deal for them. The Court declines to do so.[64] Ester has shown that repayment of the Loan would impose an undue hardship

---

[62] § 523(a)(8); *In re Alderete*, 412 F.3d at 1206-07.

[63] NCSLT's Closing Brief at 10-11, ECF No. 80.

[64] Other courts have likewise refused to wade into the murky waters of proposing a partial discharge of debt under § 523(a)(8) in the absence of a proposal by a creditor. *See, e.g., In re Stewart-Johnson*, 319 B.R. at 199 ("Yet if bankruptcy courts were required to determine how much of a partial discharge should be granted, they have to exercise a kind of family business judgment in an adversary context without even the recommendation of a neutral third party such as a trustee. Such a role would be contrary to one of the principal reforms accomplished by the Bankruptcy

16

on him. Accordingly, for Ester to be guaranteed his chance to "start afresh"[65] and become a functional and thriving citizen, the Court finds the entire balance of the Loan should be discharged.

## Conclusion

Ester has met all three requirements of the *Brunner* test and is entitled to discharge of the debt owed to NCSLT. A separate judgment consistent with this Memorandum Opinion is entered concurrently herewith.

Dated this 26th day of March, 2024.

7900.10

BY THE COURT:

TERRENCE L. MICHAEL, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

---

Code, which was to remove bankruptcy judges from administrative functions and limit them to the proper judicial role of resolving disputes.").

[65] *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934) (quoting *Williams v. U.S. Fid. & Guar. Co.*, 236 U.S. 549, 554-55 (1915)).